IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE


| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| BT HOLDING III, LLC, | . | Case No. 09-11173(CSS) |
| *et al.*, | . | |
| | . | Oct. 5, 2009 (11:39 a.m.) |
| Debtors. | . | Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

<u>Appearances</u>:

| | |
|---|---|
| For the Debtors: | Robert J. Dehney, Esq.<br>Morris, Nichols, Arsht & Taylor |
| For the Committee: | Jay Indyke, Esq.<br>Cooley Godward |
| For the U.S. Trustee: | Patrick Tinker, Esq.<br>U.S. Trustee's Office |
| For SUN Financial: | Wendy Walker, Esq.<br>Morgan Lewis |

| | |
|---|---|
| <u>Audio Operator</u>: | Leslie Murin |
| <u>Transcriber</u>: | Elaine M. Ryan<br>(302) 683-0221 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: All rise.

2          THE COURT: Please be seated.  Mr. Dehney MIA?

3          MR. BRADY: Mr. Dehney and Mr. Tinker are out

4    discussing the hearing, so -

5          THE COURT: Do you need a recess or more time?

6          MR. BRADY: Mr. Ward just went to check to see if

7    they're ready.

8          THE COURT: We're losing people.

9          MR. BRADY: They went around the corner, so they may

10   not know that the hearing ended, the prior hearing.

11         THE COURT: That Mr. Dehney.

12         UNIDENTIFIED SPEAKER: Good morning, Judge.

13         THE COURT: Let's take a recess.

14         MR. BRADY: Thank you, Your Honor.

15         (Whereupon at 11:40 a.m., a recess was taken in the

16   hearing in this matter.)

17         (Whereupon at 11:44 a.m., the hearing in this

18   matter reconvened and the following proceedings were had:)

19         THE CLERK: All rise.

20         THE COURT: Please be seated.  Glad we found you,

21   Mr. Dehney.  Last week we lost Mr. Collins.  That's just not

22   a good trend.

23         MR. DEHNEY: I apologize, Your Honor.  Robert Dehney

24   from Morris, Nichols.  I was in the hallway talking to Mr.

25   Tinker trying to resolve issues for purposes of the motion

1    before the Court today.  I'm not sure if we have resolution

2    on the issues raised by the Committee but if I can let Your

3    Honor know where the debtor is in terms of the U.S. Trustee's

4    objections and how we would intend to proceed today.  First,

5    Your Honor, I know the docket is quite busy, so I wanted to

6    give Your Honor a little overview of Big Ten and who we were

7    and how we arrived here, just to refresh everyone's

8    recollection, if that's okay.

9            THE COURT: Yes.

10           MR. DEHNEY: Your Honor, if you will recall, we

11   filed beginning of April.  SUN or SUN Entity was the secured

12   creditor and a transaction was structured to do a sale

13   process.  The two big gating issues for Big Ten as an

14   operating entity were above-market leases and the overall

15   secured indebtedness that had ultimately been place on the

16   company.  The company had a Board of Directors with two

17   independent directors including Alan Miller, who were in

18   charge of dealing with interactions with SUN as a purchaser.

19   We started the sale process and up until the filing, which

20   then continued the sale process, there was a marketing effort

21   by SS&G pre-petition.  They continued post-petition,

22   ultimately produced no overbids related to the assets.

23   Leading up to the filing, the company had paid their vendors

24   and obligations generally in the ordinary course of business.

25   This was really just to deal with the balance sheet issue in

1    an effort to try to renegotiate the leases.  With respect to
2    renegotiating the leases, the way the purchase agreement was
3    set up, there was the purchase agreement and then there was a
4    TSA or transition service agreement.  So, going into the
5    case, the company had several million dollars of cash on hand
6    where we had the ability to use cash collateral.  We had
7    debtor-in-possession financing to the extent we went beyond
8    that, and if Your Honor will recall, we had a couple of
9    critical trade vendors where we were in front of you a few
10   times, the tire manufacturers, where we were skirmishing
11   about just how much they needed as adequate protection.
12   Ultimately, on the petition date through the closing date, we
13   had cash and DIP.  The purchase agreement had the purchaser
14   assuming the obligation to pay and perform post-petition
15   obligations as well as certain priority obligations in
16   connection with the sale.  Additionally, because one of the
17   reasons for filing was dealing with the real property leases,
18   the transition service agreement allowed for the closing of
19   the transaction but then a transition period during which the
20   debtors still operated those stores, had those employees, and
21   the purchaser without negotiating with landlords to try and
22   obtain additional concessions if they reached a successful
23   conclusion, there would be an assumption and assignment on
24   amended terms, if not, ultimately the store was kicked back
25   to us and that we would file a rejection.  We had the sale

1    hearing at which the Committee and the purchaser reached a

2    resolution on the sale proceeding, a $250,000 amount of cash

3    designated for the unsecured creditors, and that was reached

4    at by the parties' understanding, based on the company's

5    numbers, and the way the agreements worked.  The post-

6    petition obligations were going to be paid, 503(b)(9) were

7    going to be paid.  Everyone heard loud and clear, that had to

8    be taken care of, and there was a belief that there were

9    going to be no ultimately allowed priority claims that would

10   have to be paid that would invade the 250.  We closed, and

11   frankly, we haven't been back in front of Your Honor since

12   the closing because it has worked as we contemplated.  The

13   transition period continued post-closing, the purchaser

14   negotiated amended terms with the landlords for which we sent

15   notices of assumption and assignment.  We've not had any

16   contests in front of you.  There have been rejections, so to

17   the extent that property or leases were deemed not to be part

18   of the go-forward purchaser, they've all now been rejected.

19   So as we sit here now, the only other material event that has

20   occurred is, after the sale process, the company filed a

21   motion for a bar date, and two bar dates have now come and

22   gone, the unsecured claim bar date and the government bar

23   date, and they recently just passed.  We have a claims

24   register EPIC as the claims agent, and we have begun the

25   process of looking at the claims, we, the debtors, as well as

1    Mr. Indyke and the Committee counsel to see what the claims

2    look like, to see whether all of our assumptions were

3    correct.  We filed our motion to dismiss which is why we're

4    here today, and the U.S. Trustee has raised a number of

5    objections, and I intend to address them.  First, I want to

6    start by saying, Mr. Garner is here from the company.  If you

7    will recall, he's been a first day declarant and the

8    company's witness throughout the process.  He is the CFO and

9    a director of what I'll call old co or the debtor.  He's also

10   a CFO of the purchaser.  So he is familiar with the way the

11   company's - as CFO, he has done the books, the records, dealt

12   with cash, and if we need to do a proffer we will put him on.

13   The U.S. Trustee has objected - We served the motion on all

14   creditors, to start with.  We have a 200-page affidavit of

15   service reflecting that we served everyone.  No party has

16   objected except the U.S. Trustee.  With respect to the U.S.

17   Trustee's objection, Your Honor, there are a number of items

18   they've identified.  Has Your Honor had an opportunity to

19   review their objection?

20        THE COURT: Yes, I did, and - yes, as well as your

21   motion.

22        MR. DEHNEY: Okay.  And Mr. Indyke filed, I believe,

23   a -

24        THE COURT: Yes, as well as - I received that this

25   morning, and I read the Committee's submission as well.

1          MR. DEHNEY: Thank you, Your Honor.  Your Honor, we

2     sit here today with only a handful of things to do, and I say

3     that because a lot of claims have come in.  There are claims

4     that appear on the EPIC registry as asserting either

5     administrative expense or some priority claims, there are

6     duplicate claims.  Mr. Garner and the people who work with

7     him have begun the process of looking at the claims for

8     purposes of reconciling them, so, if we were to put him on

9     the stand, and I told Mr. Tinker this, he would say that

10     they've started to look at the claims and they see claims

11     they've already paid.  There's a Georgia taxing authority

12     claim they've already paid.  There are other tax claims that

13     were filed as estimates for the fourth quarter, which are not

14     old co claims, they will be new co claims, but they're

15     certainly not claims against the debtor.  Mr. Tinker is

16     correct.  As we sit here today, we can't say everything post-

17     petition has been paid because we're not done with the claims

18     process, but what we were trying to propose through the

19     dismissal motion, is an understanding of the mechanic by

20     which we know how we would wrap this case up, and that's why

21     we contemplated coming to Your Honor, identifying how we and

22     the Committee were intending to proceed, ask Your Honor for

23     approval of the order, and then a dismissal, of course, would

24     be effective only upon the submission of certifications

25     identifying that these following tasks had been completed to

1  everyone's satisfaction, and I think the most important issue

2  that Mr. Tinker and we agree on is that we want to make sure

3  all the post-petition claims and the priority claims are

4  taken care of.  The Committee believe they were bargaining

5  for 250 to go to the pure unsecureds and not to be invaded.

6  That was certainly our goal in making sure all the post-

7  petition claims were taken care of as part of the sale

8  agreement, and because we can't sit here today, what we do

9  know, is that both we the debtors and the Committee will be

10  filing each one objection to claim motion.  We have a hearing

11  the middle of November.  No one's going to be ready to do it

12  then, but we have a hearing in the middle of December, and

13  the intention is that we will be preparing claims objections

14  to be heard on that date.  I think it's relevant to know

15  that, Your Honor, because what we're asking you to do is

16  approve this subject to the certification, and my client and

17  witness, as well as the Committee, are letting you know that

18  there's no way that can happen until we have those claims

19  either resolved by getting on the phone with people and

20  saying, Hey, you've been paid, file a notice of withdrawal,

21  and we've already had several of those, or by coming to Your

22  Honor and asking that they be resolved either through

23  reclassification or disallowance.  That's the process by

24  which we would do it, and then once those are resolved, we

25  would know with certainty that claims have either been paid

1    or it's possible that there would be a dispute between the

2    estate and the purchaser concerning the payment of an

3    obligation.  We don't think it's likely.  Frankly, given the

4    numbers involved, we would hope that if there was something

5    that fit in a grey area, we would reach an agreement to just

6    have it paid, because it would be cheaper than being here.

7    But that's how we see the claims process going.  So, to the

8    extent the U.S. Trustee has raised issues concerning the

9    process, the Court's post-dismissal jurisdiction, we think

10   we've dealt with that by virtue of the fact that we will all

11   know with a degree of certainty the U.S. Trustee was looking

12   for who will be paid, what will they be getting, will Your

13   Honor be dealing with the claims objections, and will it be

14   post-dismissal.  The U.S. Trustee raised several other

15   objections, and I'm looking at his objection now, and part

16   (A) page 5, he objects to the release.  Your Honor, the

17   Committee is looking for exculpation in connection with their

18   efforts in disbursing the monies.  I explained to Mr. Tinker,

19   we're fine carving that back.  Frankly, there's been nothing

20   that's really happened since the sale transaction through

21   today.  We don't think there are any claims or third-party

22   claims that are effectively being dismissed because nothing

23   has happened, but we are happy to carve that back so the

24   Committee is comfortable.  The next issue has to do with the

25   claims resolution process and (B) and I've outlined, Your

Honor, how we would intend to do that. Related to that, he raises a question of substantive consolidation in (E), and Mr. Garner is here. There was only one operating entity, Your Honor, the rest were special purpose entities set up for the creation of the transaction, and while parties have filed claims against other entities, historically through today, both old co and new co have paid the vendor claims in the ordinary course from one pool of cash. There is no substantive consolidation that's being affected here. The company is just going to continue to pay good claims they way they always have.

THE COURT: And the debtor currently holds the cash; correct?

MR. DEHNEY: Correct, Your Honor.

THE COURT: No formal trust has been established yet.

MR. DEHNEY: No. All that exists is the sale order that identified how the money would be moved. He raised a question about intercompany claims, and this was related to his concern about substantive consolidation. Frankly, that just benefits the unsecured creditors. To the extent there are inter-companies, our understanding is that upon dismissal, those entities aren't going to assert claims against the unsecured pool of 250 anyway. So we didn't view that as a substantive consolidation issue. It was just

1   making clear that they will not share in the 250.  We can

2   either change the way it's drafted or just strike it if that

3   concerns Mr. Tinker, but that was the purpose behind it.

4   And again, the only entities that would have claims against

5   the SPEs, Your Honor, if you'll remember the way the debt was

6   set up, it was all through the acquisition transaction, SUN

7   credit bid the full amount of their secured debt, so I'm not

8   sure there are any other claims against those entities,

9   anyway that ultimately would be paid.

10        THE COURT: Uh-huh.

11        MR. DEHNEY: Mr. Tinker questioned the need or said

12   in addition there were going to be fee applications filed for

13   allowance; how would that happen post-dismissal?  Your Honor,

14   this is not a new or different procedure or way for ending a

15   case where there's been a successful sale transaction.  We

16   thought this was a better way to approach it, but I also

17   understand that cases have been dismissed without the need

18   for fee applications, and obviously the concern we had and

19   the U.S. Trustee would be that everything is paid so that all

20   admin fees are paid.  This is a concern for Mr. Tinker.

21   Again, we can simply change that to make clear that all of

22   those fees have to be paid before dismissal is effective so

23   that the parties and the U.S. Trustee are paid an estimated

24   amount and that would alleviate the issue of having to come

25   back and deal with the fee hearing if that was a concern he

1    had.  Another concern he had, Your Honor, was what if there's

2    a dispute post-dismissal.  I think there's always

3    jurisdiction to the extent there's a dispute.  Plans are

4    consummated, cases are closed, you can always come back and

5    reopen it under 502(j).  Parties always have the ability to

6    come back to the Court to enforce orders subject to the

7    Court's inclination to do so.  What we thought we bargained

8    for here with the purchaser, frankly, was something that made

9    it clear that if anything ever happened, the purchaser

10    wouldn't try to wiggle out of the Court's jurisdiction.

11    Again, we didn't find that as harmful or offensive to the

12    estate or creditors.  We thought it was helpful, but again,

13    that can be resolved by simply eliminating it, and the Court

14    retains whatever jurisdiction it has, and we can leave it at

15    that.  Your Honor, I think the last issue that the U.S.

16    Trustee raised was the payment of the money and how it would

17    ultimately be paid out to creditors.  I would note that the

18    sale order already dealt with the 250 itself and how that

19    would be provided to the estate, to be held subject to the

20    Creditor Committee instruction for disbursement solely to the

21    unsecured creditors.  We believe we've identified the way by

22    which it would be done, so I think going back and saying,

23    Well, there shouldn't be 250 set aside.  I think that's

24    already left the station.  That was the deal that was cut by

25    the Committee in the context of allowing the sale to proceed,

1  and it was something the purchaser agreed to.  With that,

2  Your Honor, at the end of the day, the reason we're in front

3  of you, because to me as I'm going through this, it sounds

4  like there's a lot of things that are going to be deferred

5  until later, but we needed to know there was a path forward,

6  and I say that because we've all been involved in various

7  cases in front of Your Honor and the other Judges, where

8  there's been a sale transaction, challenge period has come

9  and gone or there have been resolutions reached, but in this

10  case, the U.S. Trustee has taken the position that the only

11  way to get out of this, the only outcome for this case is a

12  plan or a conversion to Chapter 7.  So, we just can't proceed

13  that way.  We don't have the money for it.  The

14  purchaser/lender has not provided any additional money at

15  this point for any type of process, and frankly, we think the

16  Code allows for a dismissal of the case for cause or the best

17  interest of creditors, and we believe that given the

18  administration of the case that will occur, in effect, that

19  we will have certainty of knowing that the money will be

20  available for the unsecured creditors, as well as the

21  mechanic devised to make the money available to them, that

22  this is ultimately the best way to maximize the value

23  ultimately that will go to the unsecured creditors.  So, we

24  believe the Trustee's objection that you can only resolve

25  sale cases like this through conversion or dismissal was not

1   well founded, and we would ask that Your Honor ultimately

2   approve our motion.  I'm going to turn the podium over now,

3   I'm not sure if parties want to address it.

4           THE COURT: Mr. Indyke, do you have anything you

5   want to say?

6           MR. INDYKE: Thank you, Your Honor.  I'll be brief

7   as the Committee's filed a joinder, and we support all of Mr.

8   Dehney's statements on the record and everything set forth in

9   the motion.  I would make note of a few things.

10          THE COURT: Let me just ask you.  What you're

11  looking for, if I understand it, is to complete a claims

12  resolution process in the Bankruptcy Court and then have

13  monies, $250,000 transferred to the Committee and then for

14  the Committee to make the distribution directly to creditors

15  based on allowed amounts pro rata and to receive some sort of

16  exculpation for those actions.

17          MR. INDYKE: Correct.

18          THE COURT: And how much of that happens pre-

19  dismissal and how much happens post-dismissal?

20          MR. INDYKE: I think that the only thing that would

21  happen post-dismissal would be the distributions themselves.

22          THE COURT: And why does that have to wait till

23  post-dismissal as opposed to pre-dismissal?

24          MR. INDYKE: Your Honor, there really isn't any

25  reason why.  I mean, I'm just, from my standpoint, we're only

1   looking to try to expedite the distribution to creditors.  If

2   it makes more sense, if Your Honor's more comfortable with

3   our making the distribution before the dismissal, then we can

4   do that.

5           THE COURT: What's the authority?  Where's the

6   authority to do this?  It sounds a lot like a plan.

7           MR. INDYKE: I don't see where the authority isn't

8   to do it.  It's a dismissal -

9           THE COURT: But don't I have limited jurisdiction?

10  I mean, you don't say 105(a), but -

11          MR. INDYKE: Let me talk a little bit about our

12  constituency in this case because our constituency has

13  changed like in a lot of cases.

14          THE COURT: And I guess the response would be, and

15  I'm thinking aloud, which is always dangerous, but

16  technically there's no authority under the Code for critical

17  trade vendor motions, and a lot of that -

18          MR. INDYKE: Yet they were approved by this Court,

19  $6 million went to pay creditors in this case.

20          THE COURT: Right, and the reason for that is -

21  among the reasons for that is efficiency and to avoid

22  irreparable harm.  I suppose you could make an argument that

23  you're doing the same thing on the back-end, which is

24  distributing funds to creditors absent specific authority in

25  the Bankruptcy Code to avoid a diminution of value to the

1    estate and ultimately a diminution of value to the creditors.

2         MR. INDYKE: That's correct.  And we also believe

3    under 1112(b) that dismissal can be made if it's in the best

4    interest of creditors and the estate, where the Court takes

5    into account the economic realities of the case.

6         THE COURT: Well, that's - Dismissal is one thing.

7    Dismissal with bells and whistles is another thing.  I mean,

8    dismissal affects the bankruptcy ends.  Property of the

9    estate reverts to the debtor as opposed to the debtor in

10   possession, which is a trustee, little "t" trustee, and the

11   debtor can do - the debtor's out of bankruptcy, automatic

12   stay doesn't apply.  The debtor is vulnerable to a race to

13   the assets, and creditors who didn't agree to a pro rata

14   distribution would be able to pursue those assets in full,

15   but isn't this also to set up, don't we just go back to a

16   position under a dismissal, a position that is as if the

17   bankruptcy hadn't happened, to a certain extent, certain

18   order remain in place.  549 says some things don't stay in

19   place.  So, unless - for instance, the $250,000 is property

20   of the estate, doesn't it go to the debtor and then the

21   debtor can do what it wants with it.

22        MR. INDYKE: But we don't believe it's property of

23   the estate any longer, Your Honor.  There was a GUC trust

24   that was established under paragraph (46) of the sale order

25   that provided that these funds were set aside for the benefit

1    of unsecured creditors in a GUC trust which was the term

2    that used in the sale order.

3            THE COURT: And GUC means?

4            MR. INDYKE: General unsecured creditor, that's the

5    euphemism for it, and the establishment of these trusts,

6    sometimes they're called SPM trusts.  We understand that

7    sometimes there have been issues and disputes about that, but

8    the time to raise those disputes are at the time in these

9    cases when you have a sale taking place, and we accomplished

10   a resolution of the sale process which included SUN's

11   obligating itself for significant claims in this case,

12   significant administrative claims, priority claims, secured

13   claims, as well as - and we said, Okay, while you've taken

14   care of all these claims, we need to have something for the

15   unsecured creditors in this case.

16           THE COURT: Well, what about the problem that your

17   client ceases to exist on dismissal?  Your client is a

18   specific creature of the Bankruptcy Code, not a formal

19   entity, not a state incorporation, or limited liability

20   company.  There is no Official Committee of Unsecured

21   Creditors when I enter the order dismissing the case.

22           MR. INDYKE: We don't have an issue with respect to

23   distributing the funds before the dismissal, in which case,

24   we are a Committee, and again, obviously we're not disbursing

25   the funds solely to the Committee.  We're distributing solely

1    to the unsecured creditors in this case.  The practical

2    reality, just for some practical because I understand we're

3    dealing with an array of issues but just talking about this

4    case in particular.

5          THE COURT: Uh-huh.

6          MR. INDYKE: The Committee's investigated whether

7    there are any other causes of action in this case.  There are

8    none.  There would be no preferences or other types of

9    actions that would be pursued in this case.  In fact, all of

10   those actions went away as part of the sale process.  The

11   claims numbers are coming in at about what we had expected

12   them to be.  We think it's going to be a quick resolution

13   process dealing mostly with duplicate claims.  The

14   distribution's going to be pretty small.  We're talking about

15   maybe a 2 percent distribution to the general unsecured

16   creditors in this case.  Now, we were able to negotiate.  We

17   said, Okay, how are we going to accomplish all of this, and

18   SUN said, Well, we're going to provide a limited amount of

19   funds pursuant to the transition services agreement which

20   benefits SUN because they do have certain executory contracts

21   if that they haven't made decisions to assume yet, they need

22   to keep the estate open, but in addition, we said we've got

23   to deal with the claims process.  So they provided some

24   limited funding available to the debtor and the Committee for

25   the claims process, but SUN hasn't agreed, and indeed no one

1    has compelled them to agree to pay other types of

2    administrative claims for a formal plan process, and we then

3    think if the case is converted, Your Honor, we believe that

4    these funds again, they've been set aside for the general

5    unsecured creditors, they are not set aside for other

6    creditors of the estate. I'm not sure what estate there is

7    for the trustee to administer, exactly. There's nothing to

8    pursue. The only thing that could happen with respect to our

9    constituency, which we would see deem harmful, would be

10   somebody making the argument that the trust could be invaded

11   somehow to pay trustee's fees and expenses and counsel's fees

12   and just delaying the distribution. It's going to be a small

13   enough distribution as it is. We don't want to make it to be

14   - it's almost nothing as it is, we don't want to make it

15   nothing. So, we're dealing with the practical way of dealing

16   with this situation, which has been dealt with in many cases

17   before.

18            THE COURT: Let me ask a question. I assume that

19   you're continuing to get paid and you're continuing to get

20   paid by SUN.

21            MR. INDYKE: We're getting paid pursuant to fee

22   applications that are filed with the Court, and there was a

23   budget provided -

24            THE COURT: So there's a budget, okay.

25            MR. INDYKE: But it's a limited budget. I think we

1    were capped at $50,000 post-closing, was the deal.  So, some

2    of those funds have already been utilized.

3             THE COURT: Is that on an aggregate basis, 50,000?

4             MR. INDYKE: Committee professionals, for the

5    Committee professionals on an aggregate post-closing.

6             THE COURT: Okay, and the debtor?

7             MR. INDYKE: There was a separate funding for the

8    debtors' professionals, Your Honor.

9             MR. DEHNEY: Your Honor, I believe ours was 75,

10   post-closing.

11            THE COURT: Okay.  And when did the closing occur?

12   June?

13            MR. DEHNEY: End of June, Your Honor.  Your Honor,

14   just that, we're probably above the 75.  We all thought this

15   would get done sooner with the bar dates we've extended, but

16   that has been a discussion we've had and at this point we

17   understand they will pay for us to finish the closing,

18   including claims objections by each of us.

19            THE COURT: Okay.

20            MR. INDYKE: Your Honor, I just was going to mention

21   as we set forth in our papers, that this is not an unusual

22   procedure.  It's been - structured dismissals, or this is not

23   the first time it's been done.  There are courts in Delaware

24   that have approved dismissals, recently in Wickes Holding,

25   New Weather Vane, and other cases, and we have recently cases

1   in Texas, Kansas, New York, New Jersey that have all approved

2   these types of structured dismissals, where it's in the best

3   interest of creditors and the estate, and it may not be

4   appropriate in every case, Your Honor, and I don't think that

5   this is going to lead into a turn into a whole bunch of

6   dismissal and distribution motions.  The facts have to be

7   right.   There's nothing to administer in this case.  There

8   really is nothing other than the claims and the distribution

9   of the funds.  There is no liquidation trust.  There were no

10  post-closing causes of action to pursue.  This is a very

11  simple case, at the end of the day, it's a very small case,

12  and the only interest we have is to insure that the

13  distribution to our remaining constituency, which otherwise a

14  lot of them have received benefits.  There's a going concern

15  operation.  Many of them received payment as critical

16  vendors, 503(b)(9)s.  Landlords received payment, they

17  received assumption of leases.  They got payments of cure

18  costs.  So, a great part of the constituency has received

19  satisaction.  There are still people that haven't been

20  satisfied with anything, and with them we were able to

21  negotiated with SUN before closing to obviate an objection

22  that the Committee may have filed to the sale to allow for

23  this limited trust to be distributed to creditors, and that's

24  what we're looking to do, to not dilute the distribution, and

25  that's all that we're looking to do.  If SUN had made

1   available funds to do a plan process, then perhaps we would

2   have done a plan process, but SUN said, This is what we're

3   paying.  This is it.  We're not paying anything more than

4   this, and so this is the procedure that we're left with, and

5   I'm just concerned that if we go into a 7 mode, what is a

6   Chapter 7 trustee going to do exactly?  The trustee is going

7   to take the view that they're going to invade the 250 that

8   right now could not be invaded in order to be paid its fees

9   and to do investigations that the Committee has already done

10  and to make a distribution - I mean, my recent experience is

11  that trustees usually don't get around to filing final

12  reports and closing cases, even in the smallest ones, for

13  many, many months, sometimes a year.  We're talking about

14  getting distributions out to creditors perhaps before the end

15  of this calendar year, which is what we were anticipating

16  doing.   So there are many practical reasons for doing it.

17  Again, we don't see that there's anything in the Code that

18  prescribes our ability to do this, as other courts have

19  recognized.

20          THE COURT: Does anyone have a copy of the sale

21  order.  It wasn't in the binder.  Specifically, the

22  applicable provision.  Mr. Dehney?  What am I looking, 46?

23          MR. DEHNEY: Yes, Your Honor.

24          THE COURT: Okay, thank you.

25          MR. INDYKE: Thank you, Your Honor.

1          THE COURT: Mr. Tinker.

2          MR. TINKER: Good morning, Your Honor.  Patrick

3    Tinker for the U.S. Trustee.  Your Honor, the objection that

4    we filed does set forth various grounds why we believe that

5    the structured dismissal being proposed here is contrary to

6    law, and there are various ways of citing forth what those

7    problems are, but I think maybe it would be most useful to

8    start with the trust language that we have here in paragraph

9    46 of the order and how that apparently came about.  The

10   concern I have, Your Honor, is that the paragraph is not part

11   of the initial sale motion, not part of anything that went

12   out to creditors, not part of the notice, not part of a

13   declaration in support of the sale.  What we have is a

14   hearing on the sale, and I was not at the hearing.  That

15   provision was not put into issue at all, and apparently, I

16   assume, it was announced at the hearing, I assume.  All I

17   know is that at some point considerably later and most

18   definitely more than 10 days later, I was reviewing the

19   motion for a structured dismissal and learned that they had

20   slipped that provision into the order.  Nobody received

21   advance notice of that provision.  Now, the provision itself

22   is odd, and it's odd for a number of reasons.  One is that if

23   you're going to have a trust, a trust isn't created out of

24   thin air.  Normally, there's a trust document.  There's no

25   document attached to the order.  There's no document within

1   the Court record at all, and my impression is that there is

2   no trust document at all.  All we have is this language

3   inserted into the order.  Now, when I learned this, I called

4   up the debtor.  I said, What's going on here?  And I called

5   up counsel for the Committee, and it was indicated to me that

6   it was the intention that all the admins would be paid and

7   therefore the expectation was that no monies would be left

8   for distribution to unsecured creditors presumably by the

9   Committee or some entity to be set up, but that is a far cry

10   from creating a trust through a sale.  There's no mechanism

11   here that was set forth.  Nobody received notice of it, and

12   yet, nonetheless, what you have is an amendment of the sale

13   agreement.  If Your Honor reads paragraph (46), what they

14   really are doing is amending the provision of the sale

15   agreement which excludes assets from the sale.  In other

16   words, rather than transferring the $250,000 to the purchaser

17   as part of the assets to be sold, it's carved out of that,

18   meaning that it remains in the estate.  So, if we look at the

19   beginning of that paragraph, it's clear that what they

20   intended to do was to take it out of the assets being sold.

21   Now, in that way this is nowhere close to being even an SPM

22   DIP.  Now, because you don't have the secured creditor

23   reportedly taking monies that is has, separate and apart from

24   everything, and giving it to the Committee as a gift, a

25   charity, I guess.  You don't have that here.  We have a

1  problem with SPM gifts generally, the U.S. Trustee's Office
2  does, but we don't have that procedure followed here.  What
3  do you see when you see an SPM gift in other cases?  Well,
4  generally you see a motion.  You see some kind of a document.
5  We have nothing like that here, and so, Your Honor, to state
6  that there is a trust at all set up here, Your Honor, I would
7  suggest that it was done by sliding a provision into the
8  order without notice to anybody, without anybody having a
9  right to object, and if the Committee is now taking the
10 position that this is not property of the estate and Your
11 Honor were to determine that, you don't think it's property
12 of the estate, if Your Honor holds that, and then the
13 question is, well, which . . . (indiscernible) should you
14 have over it?  Counsel for the Committee cited the Wickes
15 case.  Now what's interesting about Wickes is, first of all -
16       THE COURT: I'm sorry, which case?
17       MR. TINKER: It's the Wickes Furniture case.
18       THE COURT: The Rich -
19       MR. TINKER: Wickes, W-I-c-k-e-s.
20       THE COURT: Oh, Wickes.
21       MR. TINKER: Okay.  I'm from a different part of the
22 country, I apologize, sorry.  But in the Wickes case, the
23 Court did approve an SPM trust, and you had a motion which
24 was in many ways similar to the motion here.  For example, it
25 had a request for certain procedures for objecting to claims.

1    Now, if we go to the order that was entered in that case,

2    Judge Carey granted the motion in part.  There are parts of

3    the motion that he did not grant, and what you won't find

4    there is an objection procedure for claims against a trust

5    that isn't property of the estate.  So, Your Honor, if this

6    is a trust, if we start off with that ball in view, if that's

7    not estate property, well, that sets us along a very

8    different track than that being proposed here by debtors'

9    counsel, because then we have jurisdiction issues and that

10   was one of the issues being raised in <u>Wickes</u> by the U.S.

11   Trustee's Office.  But beyond that, Your Honor, the kinds of

12   objections I'm raising here were not raised in <u>Wickes</u>, and

13   what you don't have cited by the debtors or by the Committee

14   is any case law authority explaining what the authority of

15   the Court is to do something like this, and, Your Honor, if

16   you go, for example, to the <u>Wickes</u> order, what you don't find

17   is a series of findings of fact and conclusions of law under

18   Rule 7052 setting forth the basis for the Court's decision

19   that specifically address the kinds of legal objections I'm

20   raising here today, and, Your Honor, I would submit that the

21   reason you don't find that kind of discussion is because it

22   wasn't had.  Now, the problem with relying upon orders like

23   this is, of course, that you don't have the big picture.  You

24   don't have an analysis by the Court that the Court intended

25   to be published which addresses the various issues that are

1    brought before the Court, a considered opinion setting forth

2    what the law would be.  All we have is an order granting a

3    motion in part.  Your Honor, the Committee described the

4    trust as - I'm not sure of the exact phrase, but it's

5    something like it's almost nothing.  Your Honor may know that

6    I have not been present here in Delaware for much longer

7    than, well about a year or so.  Where I come from, other

8    parts of the country, I've practiced in other parts of the

9    country, and while we have many cases here that are huge,

10   enormous cases, in other parts of the country people are

11   happy to have a $250,000 case, that's a great case.  That's

12   not almost nothing, and, Your Honor, if you look at $250,000

13   and at the end of the day the Court were to determine that,

14   Well, okay, just convert the case.  Convert, dismiss, we'll

15   convert the case.  What's it cost to actually distribute

16   $250,000?  Well, if you look under 326 it tells you, it works

17   out to about $15,000.  Those are trustee fees, and like I

18   said, that at the end of the day.  If you have legal issues

19   resolved, what's it cost to distribute that at the end of the

20   day?  If you don't have legal issues being address and

21   raised, it's not much in Chapter 7.  I have a lot of concern

22   about the integrity of the process, and that is because the

23   Bankruptcy Code is a Code and I remember in first year law

24   school, the professor explaining what a Code is and how in

25   all these other courses we're taking, you have common law.

1   The Code is different.  It is a set of provisions which

2   interrelate, they tie it together, they are very much

3   coordinated to tell you what the results going to be, you

4   know, a lot of very different situations and in a very

5   complicated way by people spending a lot of time developing a

6   Code.  And that's especially true of the Bankruptcy Code, and

7   when we go to the Bankruptcy Code we do see statutory

8   provisions regarding how monies are to be distributed or

9   disbursed to creditors.  So that, for example, in Chapter 11,

10  you have a plan process and the Code tells you what should be

11  in the plan with regards to setting up classes, how they are

12  set up, what kinds of classes there should be, means of

13  implementation, what kind of information goes out to people,

14  confirmation requirements, what's the effect of all of this.

15  And so, you have an entire series of provisions, and once

16  those provisions are applied, what's the end result?

17  Hopefully, you have monies being paid out to at least

18  administrative claimants but hopefully also creditors.  That

19  is the entire objective the an entire complex of Code

20  provisions.  Well, is it different under other chapters?  No,

21  there also you have a set of interrelated provisions which

22  govern distributions of monies to creditors.  So, for

23  example, if you go to Chapter 7, what are the distribution

24  provisions?  You don't have a plan?  Well, you have 725 for

25  secured creditors.  You have 726 for other monies being

1    distributed, and you have a process.  Your Honor routinely

2    has hearings on trustee final reports and accounts.  An

3    elaborate set of procedures is set up in order to have those

4    monies administered so that a trustee files a trustee's final

5    report and account, files a Form 1 which is a list of all of

6    the assets, all the monies that came in from those assets,

7    how the assets were disposed, already fully administered,

8    that on the form set out in discernable detail.  It's

9    intentionally set out that way.  They file a Form 2, which

10   addresses all the monies in and out so that anybody looking

11   at it can see how all monies are resolved and what orders

12   were used to - they can track through the orders that were

13   used to authorize various payments, and then of course,

14   ultimately you have the end result, which is that being

15   filed, now, we review it under a memorandum of understanding

16   with the Administrative Office of the U.S. Courts, it comes

17   to the Court.  The Court can look at the fee application in

18   connection with it, orders are entered, and distributions are

19   made.  We have a very elaborate procedure that has its basis

20   in Chapter 7 in the Code.  And similarly in 13 and 12, you

21   have trustees with disbursement responsibilities and plans

22   and plan confirmation requirements, et cetera.  What do we

23   have in Chapter 11 that would support this kind of relief?

24   Your Honor, I would submit that there's nothing.  Now, maybe

25   we can go to 349 and say, Well, you know, it's simply

1  outlining what the effect of a dismissal is, but there's

2  nothing in 349 which supports the kind of relief being

3  requested here.  What does 349 do?  It really sets forth the

4  limited effect of a dismissal.  The limited effect of

5  dismissal on say a subsequent paying source, what subsequent

6  discharge.  Section 349 does not set forth a reservoir of

7  power for how to distribute monies to people.  It's limiting

8  the effects of dismissal, which is the end of a case, and it

9  tells you that and no support order is otherwise, in essence

10  you're taking it back to a status quo, and Your Honor needs

11  to determine under 349 certain circumstances to what extent

12  you don't take it back to the status quo that was predating

13  the bankruptcy case.  Congress knew how to define the effects

14  of dismissal.  You don't have anything there like what's

15  being requested here.  Section 105 - Your Honor has indicated

16  his thoughts about 105 and our argument is basically

17  consistent with that.  105 is not meant as a source of

18  authority to do whatever the Court wants.  Now, I'll just

19  quote the Supreme Court case, "Whatever equitable powers

20  remain in the Bankruptcy Courts must and can only be

21  exercised within the confines of the Bankruptcy Code."  We

22  just brought the Code here, and we don't have any Code

23  provisions which support the kind of relief being requested

24  here.  What's the cause for dismissal under § 1112(b)?  Your

25  Honor, I have not filed a motion to convert to Chapter 7.

1  The reason is that, so far as I can tell, the only reason the

2  debtors are not able to do a liquidating plan here is they

3  don't want to.  I really have a lot of difficulty believing

4  that it must cost so much money to go through a confirmation

5  process.  Would it cost something?  Of course, there is

6  definitely a cost to being in Chapter 11, and all parties

7  should consider that as a case is filed and as they are

8  contemplating the effects of a sale, contemplating sale

9  prices and considering whether or not to object to a sale.

10 What we have here is a Committee, apparently working out a

11 deal with SUN at the time of the sale.  Creditors as a whole

12 are not a party to it.  I'm certainly not a party to it.  I

13 don't have a clue what's going on.  No notice is going out to

14 anybody, but you have SUN saying, Well, it's this much money.

15 Okay, 250, we'll set forth this budget.  This is all being

16 dictated by the pre-petition secured creditor, a DIP lender,

17 the ultimate purchaser, the party benefitting from the case.

18 There is a cost to being in Chapter 11.  If that cost is

19 exhortative, maybe it makes sense to convert it.  Now, it

20 brings me right now to the timing of this.  What we have is a

21 motion to set forth a series of procedures, and although in

22 my objection I set forth what I think a series of steps is, I

23 think what Your Honor has heard today is that, Well, maybe

24 there's some flexibility in the steps.  Your Honor, there are

25 certain things that you can do in a Chapter 11 case.  You

1    don't really need a motion for a structured dismissal in

2    order to do them.  Setting a bar date; well, you can file a

3    motion for a bar date.  Claims objections; they can do claims

4    objections.  There are plans with administrative expense

5    claims; they can resolve those.  You don't need a motion in

6    advance setting forth a set of procedures with ultimate

7    distributions to creditors.  Now, it may be that at the end

8    of the day they look at the administrative expense claims,

9    and oh, well now there aren't any, they're all paid.  They

10   look at the priority claims, and oh, well now there aren't

11   any, they're all paid.  They have everything resolved at the

12   end of the day.  Maybe we'll be there.  We're not there right

13   now, and if you get to that point where you have all the

14   administrative expense claims resolved and where, for

15   example, you don't have to be concerned about causes of

16   action that weren't transferred to the purchaser because

17   under the APA not all causes of action were transferred to

18   the purchaser.  At the end of the day, you're resolving the

19   asset issues in terms of maybe abandoning assets, getting out

20   notice to people of that, et cetera.  Maybe at the end of the

21   day what you come down to is a pot of money.  My position is

22   that it would be a pot of money in the estate, and at that

23   point in time, the Court can consider whether or not it's

24   appropriate to simply dismiss it because then there really is

25   nothing else to be resolved, or convert it.  And if there's

1    nothing else to be resolved, you're talking about $15,000 to

2    convert it.  Now could there be trustee attorney's fees?

3    Sure, I'm sure there can be, there's always professionals'

4    fees, but we're not talking about the $250,000 here.  If I

5    can go through some of these specific objections.

6    Administrative expense and priority claims are not required

7    to be paid.  Well, what we have is counsel saying that, I

8    think they will be paid, but we're not there, and until

9    that's done what we have is court administrative expenses.

10   My position is that monies are in the estate.  They were left

11   behind as part of the sale order, as part of the sale

12   process.  They didn't buy the $250,000, and at some point in

13   time, maybe they will be available to unsecured creditors,

14   but they shouldn't be right now, and this motion doesn't

15   require that all those claims be paid.  Substantive

16   consolidation:  There are requirements to be satisfied in

17   order for the Court to order subsequent consolidation and

18   those requirements could be satisfied in a number of

19   different ways.  One way, certainly, is by motion.  You file

20   a motion for subsequent consolidation and give notice to

21   people, and you address the various grounds for subsequent

22   consolidation.  Now, maybe that issue can be resolved through

23   the claims process because you line up the claims with the

24   right debtor, and maybe at the end of the day, we have all

25   the claims in one entity and the other debtors agree that,

1    okay, the funds from those estates or any right they have to

2    the $250,000 would be used to pay those creditors, but we're

3    not there.  What we have is creditors right now saying that

4    they have claims against the other entities.  You can't just

5    wish that away.  It's there right now today.  In the plan

6    confirmation context, we sometimes see subsequent

7    consolidation, in which case, you look at the ballots to go

8    out and at least you have each class voting and accepting a

9    plan which subsequently consolidates.  And there may be

10   problems with that in cases, but there are ways of resolving

11   it.  A motion for structured dismissal is not one of them.

12   Maybe it could be done as part of the claims process; I don't

13   know.  Distribution as to a class of creditors, that's my

14   structural argument.  The structure of the Code is you can

15   make distributions in Chapter 11 after a certain procedure is

16   followed.  We don't have that here so we don't have the

17   authority for it.  We don't have a distribution provision.

18   Impermissible releases and exculpations from liability:  I

19   haven't seen any language.  As I was listening to Mr. Dehney,

20   what I think I heard was that, forget all of that about

21   releases, exculpations from liability, injunctions against

22   doing this or that.  All that's wanted now is for the

23   Committee to be exculpated from liability for disbursing the

24   funds.  My fault with that is that if it really is a trust,

25   then you want us to have jurisdiction over it.  If it's not a

1    trust and it's property of the estate, then we have a host of

2    requirements that need to be satisfied in order to release

3    liabilities.  What we're talking about then is distribution

4    by a Committee that is post-dismissal while there's no

5    Committee, it is pre-dismissal though while still you have

6    disbursements by a Committee, not a trustee, so the debtor in

7    possession is giving up that authority.  I wonder why they

8    would; why it's even necessary.  I don't know why the

9    Committee needs to be involved in that at all if it's

10   property of the estate and it's being distributed pre-

11   dismissal.  I still have a problem as to whether or not there

12   could be a pre-dismissal disbursement under the Code, but -

13   For releases, generally speaking, what we look for is some

14   kind of consent or even some kind of masters mortgage

15   analysis, but here, we don't have anybody consenting.  The

16   exculpation from liability, not seeing it yet, I'm not sure

17   what it's for really.  What we're maybe doing in connection

18   with distributing money; is for writing a bad check?  Well,

19   that's one thing.  Is it for going through this process, a

20   structured dismissal process to be exculpated from any

21   liability regarding the relief being granted by the Court at

22   all?  That's a totally different issue, and I would draw the

23   analogy to releases under a plan.  Your Honor may approve a

24   plan as well, but there are certain requirements for

25   releases, and those requirements aren't being satisfied here.

1   It's not a procedure being requested here because we're

2   starting off with a motion and then dismissal is somewhere at

3   the tail end, and Your Honor and myself, we're here trying to

4   guess what might happen later and trying to speculate and

5   make sure all the bases are covered, and they're trying to

6   insure all the bases are covered too; but why are we doing

7   that now?  If it's appropriate to dismiss it at the tail end,

8   then address a motion to dismiss at that point in time.  Then

9   it's relatively simple.  What are the benefits of dismissal

10  at that point in time versus what are the benefits and costs

11  of conversion?  And Your Honor can make that call.

12          THE COURT: Mr. Tinker, may I ask you to wind up,

13  please.

14          MR. TINKER: I'm sorry, Your Honor.

15          THE COURT: That's alright.

16          MR. TINKER: I have been going on.  I've been going

17  on, Your Honor, because it is a significant issue to us.  If

18  you can structure a dismissal with this kind of relief, then

19  you can also structure a dismissal with other additional

20  kinds of relief and still other additional kinds of relief,

21  and you might wonder why you would ever do a liquidating

22  plan, and when Your Honor reflects back on the history of the

23  case law, Your Honor will recall that at one point in time,

24  liquidating claims were themselves quite questionable, and

25  the sales outside of a plan were considered improper by a lot

1    of courts.  What we're seeing here is avoiding the plan.  So

2    it is going much, much further than the case law would allow

3    and certainly much further than the Code would set forth a

4    basis for.

5              THE COURT: Thank you.

6              MR. TINKER: I'll finish with that, Judge, thank

7    you.

8              THE COURT: Thank you.  I'll hear a brief reply.

9    Mr. Dehney.

10             MR. DEHNEY: Your Honor, I mentioned the affidavit

11   of service.  There's the dismissal motion and the bar date.

12   I'd like to approach you with the affidavit of service

13   related to the dismissal.  Mr. Tinker goes to great pains to

14   talk about how people don't know what's going on, and if he

15   simply looks at the notice that went out to people following

16   the sale hearing - If I may approach?

17             THE COURT: Yes.  This is the instant motion?

18             MR. DEHNEY: Yes, Your Honor.

19             THE COURT: Okay.

20             MR. DEHNEY: It was noticed up - First let me start

21   by saying, he suggested language was slipped into an order.

22   This sale hearing was noticed up.  There was an objection.

23   It was adjourned probably once or twice, I don't have it in

24   front of me.

25             THE COURT: Was there a formal objection?

1          MR. DEHNEY: By the Committee, and -

2          THE COURT: And the only reason I ask that is Mr.

3     Indyke, I think, at some place said "to avoid an objection",

4     but it was to resolve it.

5          MR. INDYKE: Your Honor, I think to avoid a

6     substantive objection.  I believe we may have filed a

7     placeholder while we were negotiating.  We didn't put in

8     detail of what was in the objection.

9          THE COURT: Alright.

10          MR. DEHNEY: But it was continued a couple of time

11     while they negotiated their ultimate resolution which in all

12     instances, looking at the order and the provisions they

13     negotiated, only improved what otherwise would have happened

14     had the sale been approved over their objection.  I handed

15     Your Honor the notice because I don't want Your Honor to

16     think that creditors, and the creditors who remain are in

17     much smaller subsection than when we stared, did not have

18     notice of the resolution the Committee negotiated, the

19     outcome of the sale, and what their likely prospect of a

20     recovery would be, and that was done at the same time as the

21     notice of bar date.  So, everyone received notice.  They

22     received notice of the sale, the sale results, the

23     negotiations and the deal the Committee were able to reach,

24     and what they might be able to obtain assuming this

25     structured dismissal is ultimately approved.  And that

1    dismissal motion, I would note, has been adjourned at least

2    once.  It was originally going to be done, I think, in the

3    early fall, Your Honor, and it's been continued because the

4    thought was we would have a bar date and claims would be in a

5    better position to understand what claims still had to be

6    paid.  But no one has objected because everyone knows the

7    creditors have received notice of what they've got coming.  I

8    just want to address a couple of things.  Assuming it's

9    property of the estate, there's no prohibition in 363 from us

10   using property of the estate, and there isn't an economic

11   stakeholder who would be objecting to our use of property of

12   the estate.  363 allows it.  549 allows me to recover

13   payments that are unauthorized, but there's no prohibition to

14   making payments to pre-petition claims in the Code.  If one

15   wanted to noodle through the Code you would say, Well, at a

16   minimum, it would have to be consistent with the Code, and

17   what we're talking about is giving people a pro rata

18   distribution among the same class and that would be

19   consistent with 727.  So I don't believe there's a

20   prohibition in the Code and in fact, under 363, I believe,

21   there is authority for us to make a payment on account of a

22   pre-petition claim under 363.  And I know Your Honor asked

23   about critical trade, but I do believe Courts have found,

24   including within this Circuit, 363 is available.  And the

25   plain language simply says use of property of the estate.

1    It doesn't say how we may use it, it's up to the debtors'

2    sound business judgment.  Here we have the Committee

3    concurring.  If it's not property of the estate, Your Honor,

4    and Mr. Tinker is saying because it's in our possession, I

5    guess, it's property of the estate.  At best it might be a

6    541(d) type of interest, but we don't have the power to do

7    anything with it and certainly to the extent we are in

8    possession of it, dealing with how it would be disposed of,

9    we think, is appropriate.  I think Mr. Tinker said it's

10   unclear the Court has jurisdiction to deal with claims

11   objections because Mr. Indyke argues the money is in trust.

12   The claims were filed against the debtors.  I think the Court

13   has jurisdiction to deal with claims objections because it's

14   claims against the debtors.  The question is, who's paying an

15   ultimate amount to the creditors, but I don't think that

16   dictates whether the Court has jurisdiction over a claim

17   filed against the debtors, is on the Court's registry, and

18   has to be reconciled.  I think he misses the mark on that.  I

19   do agree that we're going to know more in December, Your

20   Honor, but fundamentally, the debtors disagree that there is

21   any provision in the Code that requires a liquidating plan or

22   a conversion as a way of resolving a case that in all other

23   instances can fairly be viewed as a successful going-concern

24   sale transaction, which obviously, the Courts in this

25   district and other Courts have found a good reason and

1   allowable purpose of Chapter 11. I think the U.S. Trustee is

2   trying to read into the Code a new policy provision that

3   requires a plan, and I would submit this is not the type of

4   case where the facts call for that type of policy, Your

5   Honor.

6         THE COURT: Okay.

7         MR. DEHNEY: We would ask that Your Honor overrule

8   the objection.

9         THE COURT: Thank you. Mr. Indyke.

10        MR. INDYKE: Your Honor, one thing I wanted to note,

11   that we wouldn't be here today but for the action that we

12   took on behalf of general unsecured creditors with respect to

13   that motion because what would have happened if we had not

14   appeared. The sale would have been approved. SUN Finance

15   would have credit bid. They would have gotten all the

16   assets. There would be no money that we'd be talking about.

17   The money wouldn't be available to everyone. I would note

18   that Mr. Tinker says, the U.S. Trustee didn't appear for the

19   sale hearing. It was the most important hearing in the case.

20   The U.S. Trustee's Office usually appears at sales hearings.

21   All kinds of things happen in connection with sales hearings

22   with respect to potential objections or objections, so I

23   can't state why the U.S. Trustee wasn't there, but what would

24   have happened? This was - SUN bargained for this asset.

25   They purchased this asset. They credit bid it in and they

1    gave this gift to the general unsecured creditors.  That was

2    the agreement that was struck.  If that deal had not been

3    struck, it's not as if that $250,000 would be sitting there

4    for some other constituency.  It wasn't there.  It wasn't

5    something that the U.S. Trustee argued, and in fact, Your

6    Honor, I'm a little nonplused about the U.S. Trustee's

7    arguments because I think I'm wondering why the U.S.

8    Trustee's Office didn't object to the sale, because by

9    looking at the sale itself, you couldn't tell if you were

10   going to be able to confirm a plan or not.  So it would seem

11   to me that the time for the U.S. Trustee to raise objections,

12   to bring on objections to potential transfers of assets and

13   agreements structured with respect to the sale of assets

14   would be at the time of the sale hearing, but the U.S.

15   Trustee didn't appear at the sale hearing at all.  And again,

16   if we had not structured this deal, we wouldn't even have

17   this $250,000 to talk about, and I'm not diminishing the fact

18   – $250,000, it's all in context.  I'm sure in the context of

19   Lehman Brothers or General Motors, one might say that it's an

20   infinitesimal fraction of the debt in this case.  In this

21   case it may not be an infinitesimal fraction but it's pretty

22   small.  If it turned out that the unsecured debt was a

23   million dollars it would be a lot more significant, but it is

24   what it is.  Your Honor, I have the <u>Wickes</u> order in front of

25   me.  That was a case where we represented the Committee in

1    that case.  In that case the Court approved what was called

2    the GUC trust agreement, which essentially had the same

3    provisions as we've just laid out in this order, and the GUC

4    trust agreement was really created by virtue of that order.

5    What we're doing here is really nothing different than

6    approving what was embodied in that GUC trust agreement.  It

7    was approved by Judge Carey in the <u>Wickes</u> case last year.  I

8    want to make a final point with respect to Mr. Tinker's

9    statement.  He made a very telling statement.  He said that

10   there used to be a day when the Court didn't approve 363

11   sales, substantial sale of all the assets of the company, yet

12   the courts eventually - decisions evolved to allow that

13   because it was practical and in the best interest of

14   creditors and the estate, and that the Courts used to not

15   allow confirmation of plans of liquidation because that

16   wasn't technically provided for in the plan, and therefore -

17   but then the Court's eventually got over that hurdle also

18   because it was presumably in the best interest of the estate

19   and its creditors and for the same reason, a structured

20   dismissal in this case is in the best interest of the estate

21   and its creditors.  Your Honor, we can spend another hour

22   arguing about the creation of SPM trusts -

23           THE COURT: No, you can't.  You've got two minutes.

24           MR. INDYKE: What I would state that we've had this

25   argument.  Mr. Tinker raises it here.  I don't think it's -

1    we're having the SPM argument here because it's been created

2    already.  It wasn't objected to.  The last time we had this

3    argument with the U.S. Trustee's Office - and they have been

4    objecting regularly to it, was in, at least with respect to

5    me, was in Sharper Image where Judge Gross overruled the

6    objection, allowed the creation of an SPM trust.  The U.S.

7    Trustee's Office appealed, then they withdrew the appeal.

8    So, we've had these arguments about SPM trusts that continue

9    to exist, and we are not aware of courts that have not

10   allowed them to proceed.  But in any event, the U.S. Trustee

11   had their opportunity at that point in time and when we

12   structured this deal, I mean, this concept of slipping

13   something, it almost seems kind of slimy.  There's nothing

14   slimy about it.  There are parties that have potential

15   objections.  There were objections that are resolved on the

16   record all the time.  There are objections on the record, for

17   example, there could be agreements to assume certain leases

18   of landlords which require the estate to pay administrative

19   obligations of landlords and to incur obligations.  Those

20   occur on the records based upon a resolution of something

21   that comes up at a court hearing.  So, this was no different

22   than that type of context.  Your Honor, for all of those

23   reasons, we ask Your Honor to overrule the U.S. Trustee's

24   objection and to grant the motion.

25          THE COURT: Alright.  Ms. Walker.

1          MS. WALKER: Thank you, Your Honor.  I promise to be

2     brief.   Wendy Walker, Morgan Lewis, for the purchaser.  I

3     did bring my hypothetical checkbook, and I know that both the

4     debtors and the Committee want to be somewhat circumspect

5     where I can be definitive about what the purchaser has agreed

6     to cover here.  The purchaser is agreeing, pursuant to the

7     APA approved by the Court, to cover all post-petition

8     ordinary course expenses associated with the go-forward

9     stores.  The Court will recall that approximately 20 leases

10    were rejected early in the case.  Only one or two others were

11    rejected.  The rest were assumed, 84 leases were assumed by

12    the purchaser.  Cure costs are being paid.  As I said,

13    ordinary course expenses related to those acquired stores are

14    being paid, and we expanded that to include all 503(b)(9)

15    claims, not just those associated with the go-forward stores.

16    And we're agreeing to pay bankruptcy administration costs,

17    meaning professionals fees and U.S. Trustee fees.  So that

18    leaves very little here that won't be covered, if anything,

19    and we don't think there will be anything and as both the

20    Committee and the debtors have made the point, since the

21    claims have only just come in, we're not through looking at

22    them yet.  We're not going to pay claims that aren't properly

23    administrative but everything else we expect will be covered.

24    Thank you.

25          THE COURT: Okay, thank you.  I'm ready to rule.

1    I'm going to deny the motion.  The specific basis for denying

2    the motion is that I believe it is completely premature.

3    There really is at this point no controversy in front of me.

4    All of the actions and procedures can either be done without

5    court order in the ordinary course or are not ripe for

6    approval at this time.  Now, having said that, I have some

7    observations.  I think this motion on a substantive basis is

8    deeply in trouble and unlikely to be approved.  First, it's a

9    fundamental tenant of bankruptcy law that state law controls

10   unless there is a bankruptcy reason to forego it.  In

11   connection with creating a trust by putting money in the

12   debtors' estate solely for the benefit of unsecured creditors

13   without doing anything more, is not a sufficient bankruptcy

14   reason for foregoing state requirements for the creation of a

15   trust.  There is no trust here.  This is property of the

16   estate.  It is perhaps a different issue as to whether it can

17   be directed to a specific class, however, even if it is

18   directed solely for the benefit of unsecured creditors, that

19   can't mean that they get to get the money on the back of

20   other creditors, including administrative or perhaps the

21   Trustee.  So I view that 250 as in effect net.  It will have

22   to be net whatever it costs to distribute it.  I do think

23   this is quite different from an SPM trust, that either occurs

24   outside the confines of the debtors' estate or formally

25   creates a trust under state law for the benefit of certain

1 entities.  Of course, the exculpation provisions are a non-

2 starter.  I've said in at least, perhaps, in some elite-type

3 panels, that I'm not sure what the heck a sub rosa plan is,

4 and I'm not sure I've ever seen one, but this comes about as

5 close as I can ever imagine one to be.  I don't find that the

6 doctrine of necessity would be applicable here.  I don't

7 think 105(a) helps.  All that gives me is the right to have

8 an equitable remedy but I need a basis in the Code.  There is

9 no basis in the Code for the type of relief being sought.

10 Alright.  I think the debtor has three choices.  Dismiss the

11 case, and by dismissal I mean, dismissal.  No extra bells and

12 whistles.  No post-dismissal retention of jurisdiction and

13 claim objection procedures and payment of claims, et cetera.

14 Dismissal is solely a return to the exante state of not being

15 a debtor in possession.  Property reverts to the debtor and

16 is available for creditors under applicable state law.  The

17 debtor loses the benefit of the automatic stay and the

18 ability to distribute pro rata, and you get back to the state

19 law race to the assets that is perhaps one of the primary

20 reasons for having a collective Chapter 11 proceeding to

21 begin with.  Convert the case to Chapter 7, put it in the

22 hands of a trustee.  It may or may not significantly cut into

23 the $250,000 that is available, but it is what it is.  I

24 agree with Mr. Tinker.  I think liquidating plans can make a

25 lot of sense.  I've approved liquidating plans.  I don't

1 think they're improper, and we'll get to that in a second,

2 but there's no question that there is an expressed and

3 contemplated way to liquidate assets including cash, and

4 that's Chapter 7.  The third choice is to do a plan.  Plans

5 are usually expensive.  Plans don't need to be expensive.

6 Plans are usually long.  Disclosure statements are usually

7 ungodly long, but they don't have to be.  In any event, it's

8 up to the parties to figure out what they want to do.  Now,

9 that was all dicta, and I want to make it clear that the

10 reason I'm denying the motion specifically is in connection

11 with the fact that I don't think there's a controversy in

12 front of me and the motion is premature, but those are my

13 thoughts and feelings on the issue.  I'm not allowed to have

14 feelings.  Those are my thoughts on the issue and beliefs,

15 and I would be hard-pressed to overcome them in a subsequent

16 proceeding.  I'd ask the debtor to submit an order under

17 certification of counsel.  Unless there's anything further,

18 and we'll try to take the next case as soon as possible,

19          (The remainder of this page is intentionally left

20 blank.)

21

22

23

24

25

1    hearing adjourned.

2              (Whereupon at 1:01 p.m., the hearing in this matter

3    was concluded for this date.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18              I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M. Ryan                          October 7, 2009
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221